*Jonathan D. Smith, Sr. v. State of Maryland*, No. 283, September Term, 2021. Opinion by Graeff, J.

**CRIMINAL PROCEDURE – PROPER REMEDY – BRADY VIOLATION**

Where there is a *Brady* violation, a new trial typically is the most severe sanction available, and dismissal of an indictment on due process grounds is an appropriate remedy only in rare cases. Even in the situation where a defendant shows willful misconduct by the State, dismissal is appropriate only where there is irreparable prejudice to the defendant that cannot be resolved by less drastic alternatives. Appellant failed to make this showing.

Where an appellant's trial is reversed for a reason other than the legal sufficiency of the evidence, there is no double jeopardy bar to a retrial.

The circuit court properly determined that appellant was not entitled to dismissal of the charges on due process or double jeopardy grounds.

Circuit Court for Talbot County
Case No. 20-K-00-006884

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 283

September Term, 2021

_____

JONATHAN D. SMITH, SR.

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Eyler, Deborah S.
      (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Graeff, J.
_____

Filed:  September 28, 2022

*Kehoe, Christopher B., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This is the sixth time that this Court has considered challenges to the convictions of Jonathan D. Smith, Sr., appellant, relating to the 1987 murder of Adeline Wilford, who was stabbed to death in her farmhouse in Talbot County, Maryland.[1]  In this appeal, appellant contends that the Circuit Court for Talbot County erred in denying his motion to dismiss the charges against him on due process and double jeopardy grounds.

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts and proceedings have been detailed in previous reported opinions.  *See Faulkner and Smith v. State*, 468 Md. 418 (2020); *Smith v. State*, 233 Md. App. 372 (2017).[2]  We set forth here only the facts needed to address the issues on appeal.

---

[1] Previous cases include: *Smith v. State*, No. 688, Sept. Term, 2001 (filed Jan. 17, 2002) (denying appellant's claims of error during trial, but remanding for a hearing on appellant's motion for a new trial), *aff'd*, 371 Md. 496 (2002); *Smith v. State*, No. 1184, Sept. Term, 2003 (filed Nov. 4, 2004) (affirming trial court's decision on remand to deny appellant's motion for new trial); *Smith v. State*, No. 850, Sept. Term, 2009 (filed June 9, 2010) (affirming trial court's denial of appellant's petition for post-conviction relief); *Smith v. State*, 233 Md. App. 372 (2017) (vacating trial court's denials of petition for a writ of actual innocence and motion to reopen post-conviction proceedings and remanding for further proceedings); and *Smith v. State*, No. 619, Sept. Term, 2018 (filed June 3, 2019) (affirming trial court's decision on remand to deny appellant's petition for a writ of actual innocence), *rev'd sub nom. Faulkner v. State*, 468 Md. 418 (2020).

[2] Faulkner and Smith were both convicted of Ms. Wilford's murder, and the Court of Appeals addressed their petitions for a writ of actual innocence in one opinion.

# I.

## The Murder of Adeline Wilford

On January 5, 1987, Ms. Wilford was stabbed to death in the kitchen of her farmhouse in Talbot County. A neighbor of the 68-year-old victim found her body. When Maryland State Police ("MSP") officers arrived at the farmhouse, they saw the keys to the house still in the door lock and Ms. Wilford lying face up on the kitchen floor. She was wearing a blue wool coat and had a pair of corded glasses around her neck. "There were numerous stab wounds to Ms. Wilford's hands and face, and a large butcher knife was imbedded in Ms. Wilford's cheek/eye area. There were numerous defensive wounds on Ms. Wilford's hands and arms, suggesting that she had struggled with her killer, attempting to ward off the attack." *Faulkner*, 468 Md. at 428.

A ground-floor window of the farmhouse was propped open with a stick. The window led to a utility room containing a washing machine. The police "lifted latent fingerprints and palm prints from various places in the home, including the exterior of the utility room window and the washing machine in the utility room." *Id.* at 428-29.[3]

Based on the condition of the farmhouse and items missing from the home, the police "theorized that one or more individuals burglarized Ms. Wilford's home on the afternoon of January 5 by entering the utility room through the propped-open window, and

---

[3] After Maryland State Police ("MSP") officers discovered the palm prints at Ms. Wilford's farmhouse, "the local MSP implemented a policy, in several jurisdictions, of collecting palm prints from all arrestees, on the chance that, if the perpetrators were engaging in a pattern of burglaries, they might return to the area and commit more offenses." *Smith*, 233 Md. App. at 393.

were in the process of stealing items when Ms. Wilford returned home." *Id.* at 429. [4] The

burglars then "stabbed Ms. Wilford to death after she entered the home, and left before Ms.

Wilford's neighbor arrived." *Id.*

## II.

### Subsequent Investigations and the Arrest of Appellant

The murder investigation continued for years. In 1991 and 1992, James Brooks told

MSP that his friend, William Thomas, advised that he and Tyrone ("Ty") Brooks

burglarized Ms. Wilford's farmhouse and stabbed her to death.[5]

The investigation stalled until December 1999, when Ms. Wilford's son asked to

have the case reopened due to information from a potential witness. *Id.* at 431-32. [6] On

January 17, 2000, Beverly Haddaway advised the police that, on the afternoon of the

Wilford murder, she observed three individuals, David Faulkner, Ray Andrews, and her

---

[4] Several items were missing from Ms. Wilford's farmhouse, including a tan pocketbook that Ms. Wilford was seen carrying on the day of the murder, her custom-made diamond and sapphire ring, and her wallet, which contained credit cards and an undetermined sum of cash. *Smith*, 233 Md. App. at 381. "The police did not recover any of these items." *Id.*

[5] MSP subsequently learned that William Thomas and Tyrone Brooks "had criminal records involving armed robbery and burglary convictions, respectively, in Talbot County in the 1980s, and that both suspects were at liberty on the day of the Wilford burglary and murder." *Faulkner*, 468 Md. at 425. "However, MSP did not attempt to determine in 1991–92 whether the palm prints left at the scene of the crime matched the palm prints of either suspect." *Id.*

[6] Ms. Wilford's son, Charles Curry Wilford, "offered a reward of $10,000 for information leading to the arrest of the perpetrator(s) and an additional $15,000 if there was a conviction." *Smith*, 233 Md. App. at 381.

3

nephew, appellant, exit a cornfield on foot near the intersection of Black Dog Alley and Kingston Road. *Id.* at 426.[7] They had blood on them. *Id.* Ms. Haddaway stated that, two years after the encounter, appellant told her that he killed Ms. Wilford. *Smith*, 233 Md. App. at 381.

Ms. Haddaway subsequently agreed to wear a wire and record a conversation between herself and appellant. During a recorded conversation on April 11, 2000, Ms. Haddaway asked appellant about "that day" she saw him on Kingston Road when "that old woman got murdered," and appellant told her that a dog had bit him and he stabbed it. *Faulkner*, 468 Md. at 433. Ms. Haddaway asked appellant: "Who killed the old woman, you? You told me you did." *Id.* Appellant answered: "I don't know." *Id.* The conversation then continued, as follows:

> [Ms. Haddaway]: . . . I just wanted to know before I died. I always think that [Mr. Faulkner] done it. You? You said you did. Why are you laughing?
>
> [Appellant]: I didn't do nothing like that.
>
> [Ms. Haddaway]: Why were you in that field with blood all over you and no coat? . . . [Y]ou said that blood [had] come off of a dog, but I think that you held her and [Mr. Faulkner] killed her. Or one of you three done it.
>
> [Appellant]: They never found out yet have they?
>
> [Ms. Haddaway]: I know that's why I want to know before I die. I [saw] you, did I ever tell anybody? You know I ain't going to tell, God damn you're my blood. I just wanted to know if you done it. I didn't really think you did. I think crazy [Mr. Faulkner] did.

---

[7] "According to an MSP officer's testimony at trial, Ms. Wilford's home was approximately two-and-a-half to three miles from the intersection of Black Dog Alley and Kingston Road." *Faulkner*, 468 Md. at 432 n.4.

[Appellant]: They could of, it's a secret when one person knows it ain't a secret when two people know.

[Ms. Haddaway]: Well all three of you know.

[Appellant]: What, there's only two of us.

[Ms. Haddaway]: It was you and [Mr. Andrews] and [Mr. Faulkner].

[Appellant]: [Mr. Andrews] wasn't there until after it was over.

[Ms. Haddaway]: Where was he?

[Appellant]: Down the road.

[Ms. Haddaway]: [Mr. Andrews] was right with you in the God damn field.

[Appellant]: That was after it was all done with.

. . . .

[Ms. Haddaway]: . . . What the hell did you kill her for or did he kill her for?

[Appellant]: I don't know I can't remember.

[Ms. Haddaway]: Jonathan you're lying because you're laughing.

[Appellant]: I can't remember.

[Ms. Haddaway]: Well why do you think I would tell anybody? I ain't never told nobody in 12 God damn years. I just wanted to know.

[Appellant]: (inaudible)

[Ms. Haddaway]: Huh?

[Appellant]: She had money.

. . . .

[Ms. Haddaway]: . . . I just wondered if [Mr. Faulkner] did it or you? Tell me. I ain't going to tell nobody. I just want to know –

5

[Appellant]: (inaudible) didn't do it.

[Ms. Haddaway]: You done it. You said you did before. Why did you kill her? . . .

[Appellant]: I knew she had money.

[Ms. Haddaway]: You knew she had money.

[Appellant]: She had money.

*Faulkner*, 468 Md. at 433-35. Appellant then stated that the men got $60,000 and split it three ways.

Appellant stated that he and Mr. Faulkner both stabbed Ms. Wilford, noting: "If there's enough money I'll do it." *Smith*, 233 Md. App. at 384. Ms. Haddaway said, "it's alright if you don't get caught," and appellant replied: "I won't get caught." *Id.*

On April 25, 2000, the police brought appellant, Mr. Faulkner, and Mr. Andrews to the Easton MSP barrack for questioning. Mr. Andrews told the police that he, Mr. Faulkner, and appellant walked to a friend's home on the day of the Wilford murder, and appellant and Mr. Faulkner "said something to the friend about 'rob or robbing.'" *Faulkner*, 468 Md. at 436. The three men left the friend's residence and walked toward Ms. Wilford's farmhouse. Mr. Andrews waited at the edge of the woods off Kingston Road while appellant and Mr. Faulkner walked across a field to the farmhouse. Approximately 20 minutes later, Mr. Andrews saw appellant and Mr. Faulkner running from the house toward the woods. They told Mr. Andrews to run, and he saw blood on appellant's shirt. They encountered Ms. Haddaway on their way to Black Dog Alley, and appellant told Ms. Haddaway that he had been attacked by a dog. When they got to

6

appellant's house, appellant and Mr. Faulkner pulled approximately $300–$400 from their pockets. The next day, when there was news of the Wilford murder, appellant told Mr. Andrews to "keep his mouth shut" about what had happened.

Appellant also talked to the police. He was advised of his rights, and "although he initially 'almost seemed happy to be answering [their] questions,' his demeanor changed when [MSP] Sergeant Jack McCauley asked if appellant and Mr. Faulkner had been involved in any criminal activity together." *Smith*, 233 Md. App. at 384. "At that point, appellant 'became somewhat withdrawn, dropped his head . . . [a]nd he became very evasive, fidgety in his seat.'" *Id.* "Appellant denied any involvement with the murder of a woman. He acknowledged his conversation with Ms. Haddaway, but he claimed that he admitted involvement in the murder because he wanted Ms. Haddaway to think that he was a tough person." *Id.*

MSP Sergeant John Bollinger subsequently questioned appellant again on April 25, 2000. Appellant ultimately confessed to breaking into Ms. Wilford's home with Mr. Faulkner, while Mr. Andrews waited outside. As discussed in more detail, *infra*, Officer Bollinger testified that appellant stated that Mr. Faulkner stabbed Ms. Wilford. When Sergeant Bollinger asked appellant if he had stabbed Ms. Wilford, appellant asked for an attorney.

### III.

### Appellant's Trial

Appellant subsequently was charged with burglary, murder, and related offenses. Trial began in February 2001. The State's fingerprint expert, Alexander Mankevich,

testified that "he never matched any of the latent prints found at the crime scene to anyone submitted as a suspect in the case." *Faulkner*, 468 Md. at 439. The State's evidence of appellant's guilt consisted of testimony from Mr. Andrews, Ms. Haddaway, and Michael Snow, a jailhouse informant, as well as appellant's statements to Ms. Haddaway and Sergeant Bollinger.

Mr. Andrews testified consistently with the account he gave to the officers. *Id.* He stated that, "in exchange for his testimony against appellant and his agreement to enter an *Alford* plea to the crime of involuntary manslaughter for his role in Ms. Wilford's murder, the prosecutor would recommend that he be sentenced to five years." *Smith*, 233 Md. App. at 387.[8] He testified, however, "that he had not been promised any financial reward or incentive to testify." *Id.* at 388.

Ms. Haddaway testified, as follows:

> [O]n January 5, 1987, she was driving on Black Dog Alley and saw her nephew, appellant, emerge from a cornfield with Mr. Faulkner and Mr. Andrews. She pulled over to the side of the road, and appellant approached her truck. His glasses were broken and repaired with tape or a [band aid], and he was wearing a white t-shirt that had "red dots" around the collar. Ms. Haddaway asked him what he was doing there. Appellant stated that he was waiting for somebody, and he thought that person was in the truck Ms. Haddaway was driving. When asked again what the men were doing, appellant said that he had just killed a dog. Ms. Haddaway called appellant

---

[8] "An *Alford* plea – derived from *North Carolina v. Alford*, 400 U.S. 25 (1970) – 'lies somewhere between a plea of guilty and a plea of *nolo contendere*.'" *Faulkner*, 468 Md. at 438 n.6 (quoting *Bishop v. State*, 417 Md. 1, 19 (2010)). "In an *Alford* plea, the defendant, 'although pleading guilty, continues to deny his or her guilt, but enters the plea to avoid the threat of greater punishment.'" *Id.* (quoting *Ward v. State*, 83 Md. App. 474, 478 (1990)). "A defendant entering an *Alford* plea, while maintaining his or her innocence, agrees to a proffer of stipulated evidence or to an agreed statement of facts that provides a factual basis for a finding of guilt." *Id.* (citing *Jackson v. State*, 448 Md. 387, 391 n.3 (2016)).

a liar. Appellant started laughing and stated: "Yes I did. I killed him cause [sic] it bit me." He told her that he had stabbed the dog. Another truck then pulled up behind Ms. Haddaway, and the three men got into the truck. As Ms. Haddaway drove away, she saw a number of police vehicles and an ambulance driving fast on Black Dog Alley and then turning left onto Kingston Road.

*Id.* at 386-87 (footnotes omitted). The jury also heard the recording of Ms. Haddaway's April 11, 2000 conversation with appellant.

Sergeant Bollinger testified that,

after he tried unsuccessfully to get [appellant] to listen to the recording of [appellant's] conversation with [Ms.] Haddaway, [he] asked [appellant] "what his involvement was in the case," and [appellant] then told the officers that [Mr.] Faulkner stabbed Ms. Wilford after she interrupted him and [Mr.] Faulkner while they were burglarizing her house. [Sergeant] Bollinger testified that [appellant] told him that, as Ms. Wilford was fighting [Mr.] Faulkner, "Ms. Wilford fell back into him and that he got blood on his shirt." [Sergeant] Bollinger further testified that [appellant] described Ms. Wilford as "wearing a blue coat, had black hair, had glasses on, on a chain around her neck." According to [Sergeant] Bollinger, "after this couple of minutes that he talked to me," [Sergeant] Bollinger asked [appellant] if he had ever stabbed Ms. Wilford, at which point [appellant] asked for an attorney.

*Faulkner*, 468 Md. at 440.

Mr. Snow, "a former Baltimore City police officer who had been convicted of bank robbery," testified that

he was housed with appellant in the same protective custody ward at the Talbot County Detention Center. At one point during their detention, he asked appellant if he really killed "that lady." Appellant "just looked at [him] and said uh-hum." When Mr. Snow asked how appellant killed her, appellant "had his hand kind of just folded like if he was holding something," and he made stabbing motions. When Mr. Snow asked appellant why he killed the woman, appellant stated that "she was an old lady" who "startled him when she came in." Appellant explained that "he was fighting with her trying to get away" when "she bit him," and he then "went crazy."

*Smith*, 233 Md. App. at 388. Mr. Snow testified that "he did not receive a plea deal or anything else in exchange for his testimony," and "he testified against the advice of his attorney because he found what appellant said to him 'appalling.'" *Id.*

At the conclusion of the State's case-in-chief, the defense called Ms. Haddaway as a defense witness. With respect to inconsistencies between her testimony and the police report of her conversation with Sergeant Bollinger, Ms. Haddaway stated that a "lot of things that they wrote down [were] wrong." *Id.* She admitted that she and Mr. Andrews' attorney, Grason Eckel, had visited Mr. Andrews together in jail, and based on the information she gave, she received "a $10,000 deposit toward a total reward of $25,000." *Faulkner*, 468 Md. at 439-40. "The police told her that, to get the $25,000 reward, all she had to do was testify, which she agreed to do 'as long as [she could] tell the truth and only the truth.'" *Smith*, 233 Md. App. at 389.

On the last day of trial, appellant testified in his own defense and denied making any incriminating statements to Mr. Snow. He acknowledged that he made inculpatory statements to Ms. Haddaway and Sergeant Bollinger, but he testified that those statements were not true. "Appellant denied taking part in Ms. Wilford's murder. He testified that he was not with Mr. Faulkner and Mr. Andrews at the time because he 'did not know neither of the (inaudible) at all, neither one.' He also denied seeing Ms. Haddaway on Black Dog Alley that day." *Smith*, 233 Md. App. at 389.

On rebuttal, the State called Sergeant McCauley as a witness for the State. "He testified that he had reviewed various newspaper articles from 1987 through 1999, and

none of the articles that he reviewed contained a description of what Ms. Wilford was wearing when she was killed." *Id.* at 390.

On March 1, 2001, the jury found appellant guilty of felony murder and daytime house breaking. Appellant's direct appeals and post-conviction petitions were unsuccessful.

## IV.

### Subsequent Procedural History

In October 2008, the Maryland Automated Fingerprint Identification System ("MAFIS") was created, providing MSP with the ability to perform electronic fingerprint searches. Approximately one year later, in 2009, MAFIS was expanded, giving MSP the additional ability to perform electronic palm print searches.

In 2011, the New York Innocence Project filed a Public Information Act request on appellant's behalf. MSP subsequently produced several recorded conversations between Ms. Haddaway and Sergeant Bollinger (the "Haddaway-Bollinger recordings"), in which Ms. Haddaway threatened to testify in a way that would lead to appellant's acquittal, "unless the State dismissed unrelated drug charges against her grandson," Landon Janda. *Faulkner*, 468 Md. at 444. Ms. Haddaway stated that she had "one word" that would let appellant "walk," explaining that the word was "crazy," and she "threatened to reveal to the jury that she had been diagnosed with 'an extensive emotional and psychological problem.'" *Id.* 450. On February 9, 2001, three days before Mr. Andrews' trial was

scheduled to begin, the State entered a *nolle prosequi* of Mr. Janda's drug charges. *Id.* at 444.[9]

In another recorded conversation between Ms. Haddaway and Sergeant Bollinger on February 2, 2001, "statements were made indicating that Ms. Haddaway had access to case files related to the Wilford murder." *Smith*, 233 Md. App. at 403. "For example, Sergeant Bollinger stated that he 'got the stuff [she] wanted [him] to get,' that she could 'see the pictures if you want,' and he got her 'two pages of a letter' and a drawing of a ring." *Id.* at 403. "Although it was not common practice for the police to permit a witness to look at case files before trial, he showed Ms. Haddaway the evidence 'at the direction of the State's Attorney's Office.'" *Id.* at 404.

In this recorded conversation, Ms. Haddaway stated that she had gone to the local jail with Mr. Andrews' counsel, Mr. Eckel, and talked with "Ray." "Although Sergeant Bollinger knew that Ms. Haddaway, a fact witness, had met with another fact witness, Mr. Andrews, he did not inform appellant's trial counsel of this fact." *Id.*

In a recorded conversation several days later, Sergeant Bollinger told Ms. Haddaway that the State's Attorney had decided to *nol pros* her grandson's case. "Ms. Haddaway wanted the decision to be in writing, but Sergeant Bollinger told her that was not going to happen." *Id.* at 405. He said: "'[T]he only thing we want, and protecting

---

[9] "A *nolle prosequi*, or *nol pros*, is an action taken by the State to dismiss pending charges when it determines that it does not intend to prosecute the defendant under a particular indictment." *Silver v. State*, 420 Md. 415, 424 n.5 (2011) (quoting *State v. Huntley*, 411 Md. 288, 291 n.4 (2009)).

whatever we're trying her[e], our interest, is all we're doing. We have three murder trials coming up.'" *Id.*

During that conversation, Ms. Haddaway stated that

"they gotta go to the jail and scrape the bottom of the bucket to find out if they can get somebody that's got six months' time a way out to see if he'll lie for 'em. And then they gotta go up to jail and try to get a federal prisoner or [an] undercover cop to try to lie for them, who's not interested in it. Who told us that he happened to be a federal prisoner and he don't give a fuck."

*Faulkner*, 468 Md. at 452. Sergeant Bollinger then asked: "Who's us? Told who?" *Id.* Ms. Haddaway answered: "Wonder. I don't have any papers on it. I just have to go by memory." *Id.*

In August 2013, appellant "filed a motion for post-conviction comparison of latent prints, requesting that the circuit court order the State to enter the unidentified latent palm prints from the crime scene into MAFIS to determine whether an unknown suspect could be identified." *Id.* at 444-45. In October 2013, prior to a ruling by the court, the State asked its fingerprint expert, Mr. Mankevich,

to run the palm prints from the Wilford crime scene in MAFIS. Mr. Mankevich retrieved the lift cards from the Hall of Records and personally entered them into MAFIS. After receiving the computer-generated list of potential matches, Mr. Mankevich compared [Mr. Brooks'] known palm prints to the palm print taken from Ms. Wilford's washing machine and the palm print taken from the exterior of the utility room window. Mr. Mankevich concluded that [Mr. Brooks] was the source of both those prints.

*Id.* at 445. The known palm prints that Mr. Mankevich used to make the match were taken from Mr. Brooks in 2011. *Smith*, 233 Md. App. at 429.

In June 2015, appellant filed a petition for a writ of actual innocence, asserting three claims of newly discovered evidence: (1) the palm print match to Mr. Brooks; (2) the

Haddaway-Bollinger recordings; and (3) a January 9, 1987 report by Mr. Keene to MSP that, at approximately 2:00 p.m. on the afternoon of the murder, he saw an Oldsmobile Cutlass parked next to the front porch of Ms. Wilford's farmhouse. The circuit court denied the petition, and this Court reversed, holding that the circuit court erred in finding that certain evidence did not qualify as newly discovered evidence and remanding for further proceedings to determine if the newly discovered evidence created "a substantial or significant possibility that the result of the trial would have been different." *Smith v. State*, 233 Md. App. at 433 (2017). On remand, the circuit court again denied the petition, and this Court affirmed in an unreported opinion. *Smith v. State*, No. 619, Sept. Term 2018 (filed June 3, 2019).

In 2020, the Court of Appeals reversed. The Court acknowledged that, at appellant's 2001 trial, there was "a substantial amount of evidence" introduced against appellant, including the testimony of Ms. Haddaway and Mr. Andrews that they saw blood on appellant after the Wilford murder, and Mr. Andrews' testimony that appellant was at the farmhouse that day. *Faulkner*, 468 Md. at 473, 479. Moreover, appellant confessed to three different people, including to Sergeant Bollinger, where he accurately stated that Ms. Wilford was wearing a blue coat and had glasses on a chain around her neck. *Id.* at 440.[10]

The Court concluded, however, that despite this evidence, there was a substantial or significant possibility that the jury would have reached a different result if the jury had

---

[10] As indicated, Sergeant McCauley testified that he had reviewed various newspaper articles from 1987 through 1999, and none of these articles contained a description of what Ms. Wilford was wearing when she was killed.

14

heard the newly discovered evidence. *Id.* at 479. It found that the palm print evidence showing that Ty Brooks entered Ms. Wilford's home through the ground-floor window, where the police believed the murderer to have entered the home, was compelling evidence, and this evidence, as well as related evidence linking Mr. Brooks and Mr. Thomas to the crime, created a substantial possibility that a jury would have found appellant not guilty. *Id.* at 468-70. The Court stated that the Haddaway-Bollinger recordings "confirm[ed] that relief [was] warranted." *Id.* at 474.

The Court then discussed the appropriate remedy. Appellant asked that the Court order his convictions vacated or, in the alternative, remand for a trial. The Court stated that it did "not exonerate" appellant, noting that appellant had confessed involvement in the murder on several occasions, and Mr. Andrews' consistent account of the murder was "difficult to reconcile" with appellant's claim of actual innocence. *Id.* at 479. The Court concluded that a new trial was warranted in light of the newly discovered evidence, where the jury could consider the conflicting evidence. *Id.* at 479-80.

## V.

### Appellant's Motion to Dismiss

On July 16, 2020, appellant filed a motion to dismiss the charges against him, asserting that the State's "willful misconduct" in suppressing favorable evidence that was material to the case violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and "no lesser remedy would adequately cure the violations." He also contended that the charges should be dismissed under the federal Double Jeopardy Clause, arguing

15

that the State "engaged in bad faith misconduct to prejudice [his] prospects for an acquittal."

The State opposed the motion. It argued that appellant's motion was untimely, asserting that the deadline for filing the motion "expired five days after discovering the allegedly previously unknown information." It also argued that the Court of Appeals had "the absolute power" to acquit appellant by exonerating him, but it declined to do so in *Faulkner*, and therefore, pursuant to the law of the case doctrine, the circuit court was "powerless to stop the mandate of the Court of Appeals for a new trial." Finally, the State asserted that the rule established in *Oregon v. Kennedy*, 456 U.S. 667 (1982), which prohibits prosecutors from intentionally "goading" a criminal defendant into moving for a mistrial, did not apply in this case because the Maryland appellate courts have not extended *Kennedy* "to *ever* bar the retrial of a case on remand."

On November 30, 2020, the circuit court held a hearing on the motion to dismiss. Appellant's counsel reiterated that the motion was predicated on two grounds: (1) due process; and (2) double jeopardy. With respect to the due process claim, the first inquiry was "whether there was willful . . . misconduct . . . by the State . . . that was not negligent but a higher level of culpability including recklessness or intentional conduct or even bad faith." The second inquiry was whether there was prejudice.

With respect to double jeopardy, counsel argued that, "if a prosecutor engages in misconduct in bad faith that is designed to prejudice the [d]efendant's chances for acquittal during a trial and a mistrial is granted[,] that such conduct should preclude a retrial."

Defense counsel argued that dismissal "was appropriate where a case was reversed and remanded because of a pattern of misconduct."

The court responded: "This is a remand from the Court of Appeals. The slate i[s] wiped clean. There is no jeopardy." It stated: "This is not a double jeopardy issue. This is whether the conduct of the State in withholding exculpatory information demands that . . . the door to the courthouse be closed to the State to further prosecute [appellant]. It's not a double jeopardy case. There is no jeopardy at this point."

The State then presented its argument. It asserted that, "[e]ven had there been a *Brady* violation . . . dismissal of an indictment as a sanction is appropriate only when less drastic alternatives are not available." It argued that dismissal was a last resort, noting that "[t]he Court [of Appeals] has issued an order for a new trial . . . . [Ms.] Haddaway is probably not likely . . . to testify. That's the remedy. And that remedy is less drastic than dismissal of the case." With respect to the motion's second ground, the State argued that appellant's double jeopardy claim was a "red herring." It asserted that a double jeopardy bar "only applies in cases of mistrial. And it has not been extended therefrom. And this [case] was not a mistrial case."

On January 7, 2021, the court issued a Memorandum Opinion and Order denying the motion to dismiss. The court noted that there was "no need to outline the *Brady* violations by the State" because they had been set forth by the Court of Appeals.[11]

---

[11] The Court of Appeals, in assessing appellant's and Mr. Faulkner's petitions for writ of actual innocence, discussed the State's failure to meet its duty to disclose: (1) in its disclosure to the defense that Mr. Keene told the police that he saw an Oldsmobile Cutlass

Addressing appellant's due process claim, the court stated that, although the State "failed to meet its legal obligation to turn potentially exculpatory evidence over" to appellant, the State's conduct did "not shock the conscience of the court." It stated that appellant "has a remedy against the State: a new trial in which exculpatory evidence can be presented."

With respect to appellant's double jeopardy claim, the court stated that "a retrial to afford a defendant an opportunity to vindicate the evils of the first trial does not trigger the double jeopardy clause . . . . It is the criminal defendant's opportunity to have the fair trial to which he or she was entitled." The court stated that "the proper remedy for [appellant] is a new trial, in which [he] would have all of the rights to object to, or otherwise test, the evidence."

## VI.

### Appellant's Subsequent Plea

On April 21, 2021, appellant pleaded guilty, pursuant to a conditional *Alford* plea, to the charges of first-degree felony murder and daytime housebreaking, with the right to appeal the circuit court's denial of the motion to dismiss. The Agreement and Proffer Statement between the State and appellant, which included 17 pages, provided, in pertinent part, as follows:

> [Appellant] is not admitting guilt to any crime and maintains his absolute innocence, but agrees that the State has sufficient evidence to support a prima

at Ms. Wilford's home, by failing to disclose that the date and time of this alleged sighting was close to 2:00 p.m. on the day of the murder, *Faulkner*, 468 Md. at 461 n.19; and (2) by "improperly suppress[ing] the agreement between the State and Haddaway to dismiss drug charges against Haddaway's grandson prior to her testimony." *Id.* at 474.

facie case that a jury might rely upon to return a guilty verdict ("Conditional *Alford* Plea"). In exchange for [appellant] entering into the Conditional *Alford* Plea, the State has agreed that the [c]ourt, if it accepts his plea, shall be bound to sentence [appellant] to life in prison with the possibility of parole, and shall be bound to suspend the balance of [appellant's] sentence with credit for time served since April 25, 2000. In addition, the parties have agreed that the [c]ourt shall place [appellant] on a period of probation on the condition that [appellant] have no contact, directly or indirectly, with the surviving children of . . . [Ms.] Wilford. The State [w]ill defer to the [c]ourt on all other terms of the probation, but [appellant], through counsel, will be free to advocate to the [c]ourt concerning the terms of probation.

\*       \*       \*

Pursuant to this agreement, the State and the [d]efense submit the following Proffer Statement in Support of Conditional *Alford* Plea Under Md. Criminal Rule 4-242(d):

> The State and the [d]efense agree that the following evidence would be offered by one of the parties at any retrial of [appellant], through the testimony of witnesses, prior transcripts, other documents, audio recordings, and photographs. The State and the [d]efense do not necessarily agree upon the truth of any particular piece of evidence nor do the State and the [d]efense agree that any particular piece of evidence would be admitted at retrial, unless expressly stated below. Some or all of the evidence described herein might or might not be heard by the trier of fact at trial, the parties nonetheless agree that the record described in this proffer is established for the purpose of consideration of [appellant's] [a]ppeal (for instance, the testimony of Ms. Haddaway, the contents of her recorded discussion with [Sergeant] Bollinger, the dismissal of charges against her grandson, and the withholding of evidence by Deputy State's Attorney Marie Hill might not be heard by a jury, but the State and Defense agree that they are crucial portions of the record for consideration of [appellant's] appeal).

\*       \*       \*

> The State and the [d]efense agree that [Ms.] Haddaway's testimony would not be admissible at any retrial in the State's case in chief . . . .

\*       \*       \*

19

The State and the [d]efense agree that then Deputy State's Attorney Marie Hill knew of the existence of witness [Ms.] Haddaway's demand that her grandson's charges be dismissed, and knew or should have known that the State *nol prossed* the charges against the grandson on February 9, 2001 and intentionally, willfully, and/or recklessly suppressed exculpatory evidence including, but not limited to, the Haddaway-Bollinger [t]apes and failed to explicitly notify counsel for [appellant] of the dismissal of the grandson's charges in exchange for [Ms.] Haddaway's cooperation, and failed to provide exculpatory evidence to the [d]efense prior to trial. The State and the [d]efense further agree that Marie Hill engaged in other intentional, willful, and/or reckless misconduct, including misrepresenting the results of exculpatory DNA evidence . . . .[12]

\* \* \*

The State and the [d]efense finally agree that: [(1)] the murder of [Ms.] Wilford occurred in Talbot County, Maryland; [(2)] [Mr.] Andrews would identify [appellant], seated in the [c]ourtroom during the retrial, as the person present at [Ms.] Wilford's home on January 5, 1987, the date of that homicide, although [appellant] denies being present, does not agree to the truth of [Mr.] Andrews' identification, and maintains his absolute innocence of any involvement in the crime; [(3)] Former [Sergeant] Bollinger and [Sergeant] McCauley would identify [appellant], seated in the [c]ourtroom during the retrial, as the person who spoke with [Ms.] Haddaway on the covertly recorded statement on April 11, 2000, although [appellant] denies the truth of the matters discussed on the recording and maintains his absolute innocence of any involvement in the crime; [(4)] Bollinger and McCauley would identify [appellant], seated in the [c]ourtroom during the retrial, as the person who gave statements to each of them on April 25, 2000, although [appellant] denies the truth of the former officers' testimony concerning his interrogation and maintains his absolute innocence of any involvement in the crime.

---

[12] Forensic DNA testing performed after the filing of charges excluded appellant as the source of DNA material "that was found in scrapings taken from under Ms. Wilford's fingernails and that came from a source other than Ms. Wilford." *Faulkner*, 468 Md. at 438, 443. "[T]he MSP crime lab had furnished the State's Attorney's Office with that information in advance of [appellant's] trial." *Id.* at 443 n.8. At no point prior to trial, however, did the State disclose to appellant's counsel information regarding the DNA test results. *Id.*

The court found that appellant knowingly and intentionally entered a plea of guilty, and it found appellant guilty of first degree felony murder and daytime housebreaking. The court imposed a life sentence, suspending all but time served, and placed appellant on supervised probation for five years.

This timely appeal followed.[13]

## STANDARD OF REVIEW

The dismissal of a criminal indictment is a matter within the sound discretion of the trial court, and we generally review the court's decision in this regard for abuse of discretion. *State v. Grafton*, 255 Md. App. 128, 143 (2022); *Kimble v. State*, 242 Md. App. 73, 78 (2019). When, however, a trial court's decision involves a question of law, such as the "interpretation and application of Maryland constitutional, statutory, or case law, we determine *de novo*, whether the trial court's conclusions are legally correct." *Grafton*, 255 Md. App. at 143; *Kimble*, 242 Md. App. at 78.

---

[13] A conditional guilty plea under Maryland Rule 4-242 (d)(2) permits the defendant to "reserve the right to appeal one or more issues specified in the plea that (A) were raised by and determined adversely to the defendant, and, (B) if determined in the defendant's favor would have been dispositive of the case." Such pleas may be tendered only with the consent of the court and the State. *Id.* The defendant has a right to a direct appeal "from a final judgment entered following a conditional plea of guilty." MD. CODE ANN., CTS & JUD. PROC. ("CJ") § 12-302(e)(3) (2020 Repl. Vol.).

## DISCUSSION

Appellant contends that the circuit court erred in denying his motion to dismiss the charges against him, for two reasons. [14] First, appellant argues that his charges should have been dismissed because the State's misconduct in suppressing evidence in violation of its *Brady* obligations was egregious, violated his due process rights, and substantially prejudiced his opportunity for a fair trial. He asserts that, under these circumstances, the proper remedy for the *Brady* violations is dismissal of the charges with prejudice, as opposed to a retrial. Second, appellant contends that his charges should be dismissed because the "State's bad-faith misconduct…trigger[ed] a double jeopardy bar to retrial."

The State agrees with appellant that the circuit court's judgment denying the motion to dismiss on due process grounds should be vacated and the charges dismissed. It disagrees, however, that the court erred in denying appellant's motion to dismiss on double jeopardy grounds, asserting that, because there was no mistrial in this case, dismissal of the charges is not warranted on double jeopardy grounds.

Although the State concedes error in the court's denial of the motion to dismiss, that is not the end of the inquiry. We are not bound by a party's concession. *See Spencer v. Md. State Bd. Pharm.*, 380 Md. 515, 523 (2004) (an appellate court "is not bound by the

---

[14] The Association of Prosecuting Attorneys filed an *amicus curiae* brief, supporting appellant's argument that dismissal of the charges against appellant, with prejudice, is required.

concessions made by the parties on issues of law, which we may independently review.") (quoting *In re Heather B.*, 369 Md. 257, 266 n. 9 (2002)).

## I.

### Law of the Case Doctrine

Before turning to appellant's two contentions, we briefly address the impact on our decision of the Court of Appeals' previous denial of appellant's request to vacate his convictions. In *Faulkner*, 468 Md. at 479, the Court stated that it did "not exonerate [appellant]," but instead, would grant him a new trial. We note that, pursuant to the "law of the case" doctrine, where an issue has been decided by the Court of Appeals, it "should be regarded as settled, *and the principles upon which such decision rests* should be taken, as far as applicable, to control" questions in subsequent litigation in the same case. *Hagez v. State*, 131 Md. App. 402, 418-19 (2000) (quoting *Cohill v. Chesapeake & Ohio Canal Co.*, 177 Md. 412, 421-22 (1939)).

Although the Court of Appeals in *Faulkner* declined to vacate Smith's convictions but instead ordered a new trial, it did so in the context of a petition for a writ of actual innocence. It was not asked to consider, as we are in this appeal, whether the State's suppression of evidence barred retrial on the grounds of due process or double jeopardy. Accordingly, the Court of Appeals did not address the issues presented to this Court, and the law of the case doctrine does not preclude us from considering them here.

## II.

## Brady Violations

In *Brady*, 373 U.S. at 87, the Supreme Court held that the State violates a defendant's right to due process if it suppresses evidence that is favorable to the defense and material to guilt or punishment. The parties here, as well as the circuit court, agree that the State's suppression of evidence, including the Haddaway-Bollinger recordings and the DNA test results, amounted to a *Brady* violation.

The issue we need to decide here is the proper remedy for the *Brady* violation. Although a retrial is the typical remedy, we must decide whether dismissal of the charges is an available remedy, and if so, under what circumstances.

Before addressing that issue and appellant's specific contentions, we note that "the dismissal of charges 'for prosecutorial misconduct is an extreme sanction.'" *State v. Graham*, 233 Md. App. 439, 459 (2017) (quoting *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987)). "[T]he sanction of dismissal should be used sparingly, if at all." *Thompson v. State*, 395 Md. 240, 261 (2006). When considering whether dismissal is a proper sanction for a *Brady* violation, it is important to keep in mind the underlying principle of *Brady*, which "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87.

**Due Process**

Appellant contends that the State's conduct was so egregious, it "shocks the conscience," and due process requires that his charges be dismissed.[15] The determination whether the government engaged in conduct that violated the defendant's due process rights is a mixed question of fact and law. *People v. Uribe*, 132 Cal. Rptr. 3d 102, 120 (Cal. Ct. App. 2011); *see also State v. Gutierrez*, 153 Md. App. 462, 470 (2003) (when a claim is based upon a violation of a constitutional right, the appellate court must make "an independent constitutional appraisal from the entire record," and the ultimate issue is a mixed question of fact and law).

Appellant does not cite any case from the Supreme Court holding that dismissal of the charges is a proper remedy for a prosecutor's violation of his or her *Brady* obligations, and we have not found one. The United States Supreme Court has stated, however, that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Appellant similarly has failed to cite a Maryland appellate court case holding that dismissal of the charges is a proper remedy for a *Brady* violation. We note that, recently,

---

[15] Appellant asserts that "[t]he Constitution, Maryland common law, and principles of justice" support his due process claim. To the extent Smith relies on the due process protections in the Maryland Constitution, the Court of Appeals has held that they afford no broader protection than that of the federal Fourteenth Amendment. *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 628 (2002).

in *Grafton*, 255 Md. App. at 151, we expressly declined to "decid[e] whether dismissal is or is not an appropriate sanction for a *Brady* violation."

In *Williams v. State*, 183 Md. App. 517, 525-27 (2008), *rev'd on other grounds*, 416 Md. 670 (2010), this Court rejected an argument that dismissal of Williams' indictment with prejudice based on repeated *Brady* violations was warranted. We stated that "the provision of a new trial is the standard remedy for a *Brady* violation, for the simple reason that evidence, which was initially suppressed, can then be presented to a new jury." *Id.* at 526. This Court found "no reason to now depart from this well-settled approach to curing such violations," noting that the evidence that had been suppressed at the first trial had been disclosed, and Williams was free to use it at the second trial. *Id.* at 526-27.

The Court of Appeals reversed Williams' convictions, on other grounds, holding that Williams was entitled to a new trial. 416 Md. at 673-74. Appellant cites this case as confirming that dismissal of charges for a *Brady* violation is an appropriate remedy. There was, however, no such holding in that regard.

With respect to the *Brady* issue, the Court held that there was no *Brady* violation, and therefore, Williams' argument that the court erred in declining to dismiss the indictment due to *Brady* violations failed. *Id.* at 693. In a footnote, the Court stated that, even if there had been a *Brady* violation, "dismissal of an indictment as a sanction is appropriate only where less drastic alternatives are not available." *Id.* at 693 n.8 (citing *Gov't of the Virgin Islands v. Fahie*, 419 F.3d 249, 254-55 (3d Cir. 2005)). This footnote clearly was not a holding of the Court of Appeals, but rather, it was dicta. Moreover, as

26

dicta, the footnote did not explore the circumstances in which dismissal of charges might be a permissible sanction. Accordingly, to decide if dismissal is a proper remedy for a *Brady* violation, and if so, under what circumstances, we look to the reasoning of other courts.

Other jurisdictions have held that dismissal of an indictment may be an appropriate remedy for a violation of *Brady*, but only in limited circumstances. In *Fahie*, 419 F.3d at 252, the United States Court of Appeals for the Third Circuit discussed "when, if ever, dismissal with prejudice is an appropriate remedy for a *Brady* violation." In that case, it was discovered during trial that *Brady* material had not previously been disclosed, and the trial court dismissed the case with prejudice. *Id.* On appeal, the court noted that, although other jurisdictions had held that dismissal could be a proper remedy, they recognized it as a rare sanction. *Id.* at 254. The court ultimately held that, although retrial typically "is the most severe sanction for a *Brady* violation, dismissal may be proper where a defendant shows both willful misconduct and prejudice. *Id.* at 255. Because Fahie could not prove willful misconduct, the court held that dismissal with prejudice on the basis of the *Brady* violations was improper. *Id.* at 256-57. It further held that, although there was prejudice to Fahie from the failure to disclose the evidence prior to trial, the prejudice "could be corrected with the lesser remedy of mistrial." *Id.* at 259.

In *Ex Parte State of Alabama*, 287 So.3d 384, 368 (Ala. 2018), the defendant was convicted of murder. After obtaining a new trial based on a *Brady* violation, he moved to dismiss the indictment against him with prejudice as a sanction for the State's misconduct. *Id.* at 387. The circuit court granted the motion. *Id.*

In reversing that ruling, the Supreme Court of Alabama held that "the dismissal of an indictment is an extreme sanction that should be used <u>only</u> when a lesser sanction would not achieve the desired result. To warrant dismissal of the indictment the defendant must establish intentional or willful misconduct by the State <u>and</u> irreparable prejudice." *Id.* at 396. It explained:

> The obvious rationale for limiting the sanction of dismissal of criminal charges to only those cases where no other sanction can remedy the prejudice to the defendant is to insure that the public's interest in having persons accused of crimes brought to trial is not sacrificed in the name of punishing a prosecutor's misconduct. And, of course, where the prosecutor's failure to make discovery has not irreparably prejudiced the defendant, the sanction of dismissal punishes the public, not the prosecutor, and results in a windfall to the defendant.... [T]he rule authorizing the imposition of sanctions for discovery violation[s] was 'never intended to furnish a defendant with a procedural device to escape justice.'

*Id.* at 395-96 (quoting *State v. Carpenter*, 899 So.2d 1176 (Fla. Dist. Ct. App. 2005)). The Court held that the prejudice suffered by the defendant in the first trial due to the suppressed evidence could be corrected by a new trial, and therefore, it was error to dismiss the indictment. *Id.* at 399.

In *United States v. Pasha*, 797 F.3d 1122, 1138 (D.C. Cir. 2015), the United States Court of Appeals for the District of Columbia stated that, once a *Brady* violation has been found, "a new trial follows as the prescribed remedy." The rationale is that, when there is

a failure to disclose evidence, the defendant can introduce the previously suppressed evidence at the new trial. *Id.* If, however, a new trial "does not cure the prejudice, more is required." *Id.* In fashioning the applicable analysis for a *Brady* violation following a conviction, the Court stated:

> (1) a *Brady* violation requires a remedy of a new trial; (2) such new trial may require striking evidence, a special jury instruction, or other additional curative measures tailored to address persistent prejudice; and (3) if the lingering prejudice of a *Brady* violation has removed all possibility that the defendant could receive a new trial that is fair, the indictment must be dismissed.

*Pasha*, 797 F.3d at 1139. The Court concluded that "dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant. *Id.*

The Court ultimately ordered a new trial "with appropriate remedies to cure the damage caused by the Government's delayed disclosure." *Id.* at 1125. Noting the defense's suggested remedies, such as precluding the Government from introducing evidence or precluding cross-examination of a witness, that Court stated that, "if a remedy is available that gives the defendant a fair trial—such as precluding cross-examination completely or precluding impeachment with a prior statement—that remedy is preferable to dismissal of the indictment." *Id.* at 1140.

Other jurisdictions similarly recognize that dismissal of an indictment on due process grounds based on *Brady* violations is a rare sanction that is appropriate only when less drastic alternatives are not available. *See e.g., United States v. Mauskar*, 557 F.3d 219, 231-32 (5th Cir.) (noting that dismissal based on prosecutorial conduct is appropriate only in the "rarest circumstances" and holding that the *Brady* violation was not so "shocking to

29

the universal sense of justice" that the government should be deprived of the opportunity to retry the defendant.) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973), *cert. denied*, 556 U.S. 1277 (2009)); *State v. Arrasmith*, 966 P.2d 33, 45-46 (Idaho Ct. App. 1998) (dismissal of an indictment is an appropriate sanction for a *Brady* violation only when a less drastic alternative is not available); *Commonwealth v. Burke*, 781 A. 2d 1136, 1144 (2001) ("Because of the compelling societal interest in prosecuting criminal defendants to conclusion . . . dismissal of charges is an extreme sanction that should be imposed sparingly and . . . only in cases of blatant prosecutorial misconduct.").

Here, the record shows willful misconduct by the State in failing to disclose exculpatory evidence. In *Fahie*, 419 F.3d at 256, the court noted that willful misconduct involves conduct that is "intentional, knowing, or reckless." (quoting *Wehr v. Burroughs Corp.*, 619 F.2d 276, 281 (3d Cir. 1980)).

The State has taken conflicting positions during litigation on this issue. In the circuit court, it argued that there was no willful misconduct. It asserted that, although it did not turn over evidence prior to the first trial, it ultimately, "produced all of this evidence without a motion to compel, and assisted the Defendant at every step of the way to gather this information." The circuit court found that the State's failure "to meet its legal obligation to turn potentially exculpatory evidence over to [] Mr. Smith" was "troubling," but it did not "shock the conscience of the court."

30

Subsequent to the court's ruling on the motion to dismiss, however, the parties submitted a proffer in support of a plea agreement, and the State conceded that it committed willful misconduct. The proffer stated:

> The State and the Defense agree that then Deputy State's Attorney…knew of the existence of witness Haddaway's demand that her grandson's charges be dismissed, and knew or should have known that the State nol prossed the charges against the grandson on February 9, 2001, and intentionally, willfully and/or recklessly suppressed exculpatory evidence including, but not limited to, the Haddaway-Bollinger tapes and failed to explicitly notify counsel for Smith of the dismissal of the grandson's charges in exchange for Haddaway's cooperation, and failed to provide exculpatory evidence to the Defense prior to trial. The State and the Defense further agree that [the prosecutor] engaged in other intentional, willful, and/or reckless misconduct, including misrepresenting the results of exculpatory DNA evidence.

Based on this record, the State conceded that there was willful misconduct, and we agree. This conclusion, however, is not the end of the inquiry.

As other courts have held, dismissal of an indictment is an appropriate remedy for a *Brady* violation only in limited circumstances. There is a reasonable public "expectation that those who have been charged with crimes will be fairly prosecuted to the full extent of the law." *Burke*, 781 A.2d at 1144 (quoting *Commonwealth v. Shaffer*, 712 A.2d 749, 752 (1998)).

We agree and hold that, when there is a *Brady* violation, a new trial typically is the most severe sanction available. The extreme sanction of dismissal of an indictment is warranted only in rare cases. Even in the situation where a defendant shows willful misconduct by the State, dismissal is appropriate only when: (1) the misconduct results in irreparable prejudice; and (2) no less drastic alternative is available. As explained below,

31

appellant failed to make this showing, and therefore, the circuit court properly determined that he was not entitled to dismissal of the charges.

Although evidence was improperly suppressed prior to the first trial, appellant has not shown that he has suffered irreparable prejudice that could not be corrected by a new trial. The evidence that was suppressed has not been destroyed. Rather, it has now been turned over to appellant, who would be free to use it in a new trial. He could introduce the evidence that Mr. Keene saw an Oldsmobile Cutlass at Ms. Wilford's house around the time of the murder, and that he was excluded as a source of DNA found in scrapings of Ms. Wilford's fingernails. He could also introduce other newly discovered evidence, including the evidence, discovered in 2013, that the palm print found at the scene of the crime matched Mr. Brooks.

To be sure, as appellant points out, the death of Ms. Haddaway, a key State's witness against him, prevents him from using the previously suppressed Haddaway-Bollinger tapes to cross-examine her about the tapes, including impeaching matters revealed in her statements, such as statements that her testimony hinged on the State dismissing unrelated drug charges against her grandson. There are, however, less drastic remedies than dismissal that would provide appellant with a fair trial. Ms. Haddaway's prior testimony against appellant could be excluded in the State's case-in-chief, which the State has previously recognized is an appropriate remedy. To the extent that appellant believes that previously suppressed evidence relating to Ms. Haddaway would be helpful to impeach other witnesses, appellant could do so, if he thought it was in his best interest.

32

With respect to the fading memories of the witnesses that appellant may want to call, the record reflects prior statement made. We are confident that a remedy less drastic than dismissal could be found.

Appellant has failed to meet his burden to show that due process required the extreme remedy of dismissal of the charges as a result of the State's suppression of evidence at his first trial. The circuit court did not err in denying the motion to dismiss the charges on this ground.

## IV.

### Double Jeopardy

Appellant's second contention is that a new trial would violate his right against double jeopardy. Whether principles of double jeopardy bar a retrial is a question of law, which we review *de novo*. *Giddins v. State*, 393 Md. 1, 15 (2006).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. CONST. amend. V. [16] "Double Jeopardy, under both the Fifth Amendment and at common law, bars multiple punishments and trials for the same offense." *State v. Long*, 405 Md. 527, 536 (2008). As a general rule, however, "a criminal defendant ordinarily may be retried after obtaining appellate reversal of a

___

[16] The federal Double Jeopardy Clause was applied to the states in 1969. *State v. Smith*, 244 Md. App. 354, 385 (2020). "Maryland is one of only five states that does not have an analogue to the Fifth Amendment's Double Jeopardy Clause in its own constitution . . . but equivalent protections are a fundamental part of Maryland common law." *Id.* at 382.

conviction." *Hagez v. State*, 131 Md. App. 402, 423, *cert. denied*, 359 Md. 669. "This precept rests on the notion 'that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean.'" *Id.* (quoting *North Carolina v. Pearce*, 395 U.S. 711, 721 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).

There is, however, an exception to the general rule that appellate reversal of a conviction does not bar retrial. The "Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence." *Id.* at 424 (quoting *United States v. DiFrancesco*, 449 U.S. 117, 131 (1980)). That exception does not apply here.

Appellant's contention relies on *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982), where the Supreme Court held that the Double Jeopardy Clause bars a retrial if the government engages in conduct "intended to 'goad' the defendant into moving for a mistrial." The Court explained: "[[t]he Double Jeopardy Clause] bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *Id.* (quoting *United States v. Dinitz*, 424 U.S. 600, 611 (1976)).

*Kennedy* does not support a dismissal in this case because there was no mistrial. There was a conviction, which appellant succeeded in getting reversed. In this situation, the Supreme Court has been clear:

"[I]f the first trial has ended in a conviction, the double jeopardy guarantee 'imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside' (emphasis in original). *North Carolina v. Pearce*, 395 U.S., at 720, 89 S.Ct., at 2078. 'It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.' *United States v. Tateo*, 377 U.S., at 466, 84 S.Ct., at 1589. '[T]o require a criminal defendant to stand trial again after he has successfully invoked a statutory right of appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect.' *United States v. Scott*, 437 U.S., at 91, 98 S.Ct., at 2193. There is, however, one exception to this rule: the Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence."

*DiFrancesco*, 449 U.S. at 131.

As Judge Moylan explained in *Hagez*: "[T]he appellant's first trial ended in a conviction. That conviction was reversed for a reason other than the legal insufficiency of the evidence. There is, therefore, no double jeopardy bar to a retrial. That is all that needs to be said." *Id.* at 443 (Moylan, J., concurring).

Other courts have rejected arguments similar to that made by appellant. *See, e.g., United States v. Lewis*, 368 F.3d 1102, 1107 (9th Cir. 2004) ("[b]arring a retrial for the prosecution's alleged intentional *Brady* violations would be an unnecessary expansion of the Double Jeopardy Clause"); *Green v. State*, 380 S.W.3d 368, 374-75 (Ark. 2011) (declining to extend *Kennedy* beyond circumstance where prosecutor has intentionally provoked a mistrial and holding that a new trial based on a *Brady* violation was the relief to which Green was entitled).

The circuit court properly concluded that appellant's "expansive reading of double jeopardy is not the law." It properly denied appellant's motion to dismiss based on double jeopardy and determined that the proper remedy for the *Brady* violations here was a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**